IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CINDY LACAVA,

        Plaintiff,

    vs.

MERCED IRRIGATION DISTRICT, et al.,

        Defendants.

_____/

CASE NO. 1:10-CV-00853 LJO DLB

ORDER ON DEFENDANTS' MOTION TO
EXCLUDE EXPERTS AND MOTION FOR
SUMMARY JUDGMENT

(Docs. 25 & 26)

Now pending before the Court is Defendant Merced Irrigation District's ("MID's") motion to exclude expert testimony and motion for summary judgment. Plaintiff Cindy LaCava ("Ms. LaCava") has opposed the motions, and MID has replied. Upon careful consideration of the parties' arguments and the record in this case, the Court GRANTS the motion to exclude expert testimony and GRANTS IN PART and DENIES IN PART the motion for summary judgment.[1]

## I.    BACKGROUND

### A.    Factual Background

Ms. LaCava is a former employee of MID, an irrigation and utility provider. Ms. LaCava was first hired by MID on September 24, 2001 as a Customer Account Representative with a starting salary

---

[1] Omission of reference to any evidence, argument, or objection in the discussion below should not be construed to the effect that the Court did not consider the evidence, argument, or objection. The Court carefully considered the parties' positions and reviewed and applied all evidence deemed admissible, material, and appropriate. The Court does not rule on general evidentiary matters in a summary judgment context, unless otherwise noted.

1

classification of Level 13, Step 1 ($27,204 annual salary).  Ms. LaCava was subsequently promoted to the position of Electric Services Clerk in March 2002 and then to Customer Service Manager in May 2006.  Ms. LaCava held this position until she was discharged from MID in February 2010, the events leading up to which form the basis of this lawsuit.

### 1.        Issues Regarding Unequal Pay

Upon being promoted to Customer Service Manager in May 2006, Ms. LaCava was informed by one of her superiors, Jem Brown, that the position would be given a Level 24 salary classification.  However, shortly after accepting the position, Ms. LaCava received notice from MID that the position would only be classified at Level 22, Step 1 ($47,856 annual salary).  When Ms. LaCava questioned Jem Brown about this discrepancy, she was informed that MID would not allow her salary to be classified four levels above that of Lamont Tumbling, the male employee who had worked in a somewhat similar position before the creation of the Customer Service Manager position.

Two years later, Bob Blum, the Director of Administrative Services, instructed Ms. LaCava to research comparable salaries in other irrigation districts.  On May 22, 2008, Ms. LaCava submitted the job descriptions and salary ranges for customer service manager positions in two neighboring districts: a customer service manager for the Turlock Irrigation District was paid between $7,235-$9,260, and a customer service manager for the Modesto Irrigation District was paid between $6,777-$11,175.  The pay range for Ms. LaCava's position at MID was then $4,400-$5,349.  Despite this information, MID elected not to raise Ms. LaCava's salary classification at that time, even though the classifications for other positions held by male employees were raised.

MID's planned budget for 2009 did include a reclassification of Ms. LaCava's salary to Level 24.  However, the salary increase was never implemented as budgeted on January 1, 2009.  Therefore, on January 30, 2009, Ms. LaCava complained to her supervisor at the time, David Carroll, about the disparity in pay between male and female managers at MID.  In response, David Carroll prepared an internal benchmark survey regarding Ms. LaCava's position and pay.  The survey concluded that Ms. LaCava was the lowest paid manager at MID and recommended immediately promoting Ms. LaCava to a higher salary classification.  After additional prodding by Ms. LaCava's attorney, MID eventually reclassified Ms. LaCava's salary to Level 24 in June 2009.

### 2.    Complaints of Sexual Harassment

In addition to her concerns of unequal pay, Ms. LaCava felt exposed to sexual harassment.  In December 2008, Ms. LaCava and Linda Davidson complained of sexual harassment in the workplace by a male employee.  In response, MID retained a third party, Trudy Largent, to investigate the matter.  Trudy Largent ultimately concluded that sexual harassment existed.

### 3.    The DFEH Complaint

On September 10, 2009, Ms. LaCava filed a complaint with the California Department of Fair Employment and Housing ("DFEH") regarding sex discrimination based on unequal pay.  Ms. LaCava specifically alleged that (1) from approximately January 1, 2009 through July 30, 2009, she was denied equal pay; (2) she believed that she was denied equal pay because of her sex; (3) on January 1, 2009, she was denied a step increase while other male managers were given an increase; and (4) investigation will reveal that she is paid less than her male counterparts.  Ms. LaCava received her right to sue letter from the DFEH on October 12, 2009.

### 4.    Ms. LaCava's Discharge

In January 2010, John Sweigard was appointed as MID's new General Manager.  As General Manager, John Sweigard forwarded a customer complaint involving a friend's account to Vanessa Lara, Ms. LaCava's new supervisor, and instructed Vanessa Lara to investigate.  The investigation revealed that certain customer service representatives had mishandled issues regarding disconnect notices.  This was relayed to John Sweigard, who, along with Vanessa Lara, drafted a Management Deficiency Report disciplining Ms. LaCava.

On January 25, 2010, Ms. LaCava was called into a meeting with John Sweigard and Vanessa Lara.  There, Ms. LaCava was disciplined and provided a copy of the Management Deficiency Report, which was to be placed in her file.  Ms. LaCava attempted to present an action plan addressing the issue to John Sweigard, but he rejected it.  Instead, he gave Ms. LaCava until February 1, 2010 to submit a rebuttal to the Management Deficiency Report.

Ms. LaCava submitted her rebuttal to the Management Deficiency Report on February 1, 2010.  On February 2, 2010, John Sweigard presented a proposal to the Board of Directors for reorganizing MID's personnel; the Board of Directors approved.  The same day, Ms. LaCava was informed by John

1  Sweigard that her position had been eliminated.  Approximately two weeks later, Ms. LaCava had a

2  meeting with John Sweigard.  According to Ms. LaCava, John Sweigard essentially asked her to drop

3  her complaint with the DFEA in exchange for reinstatement.  John Sweigard denies this and recollects

4  only encouraging Ms. LaCava to apply for other positions at MID.

5  **B.     Procedural History**

6  Ms. LaCava initiated this civil action on May 14, 2010.  The original and operative complaint

7  asserts four causes of action: (1) sex discrimination in violation of 42 U.S.C. § 2000e and California

8  Government Code Section 12940; (2) retaliation in violation of California Government Code Section

9  12940(h); (3) retaliation against a whistleblower in violation of California Labor Code Section 1102.5;

10  and (4) failure to prevent workplace sex discrimination in violation of California Government Code

11  Section 12940(k).[2]  As relief, Ms. LaCava seeks monetary damages.

12  On December 9, 2011, MID filed the now pending motions.  MID seeks to exclude the expert

13  testimony of Dr. Ricky A. Sarkisian as unreliable pursuant to Federal Rule of Civil Procedure 702 and

14  seeks summary judgment on all of Ms. LaCava's claims pursuant to Federal Rule of Civil Procedure 56.

15  Ms. LaCava filed oppositions to the motions on February 1, 2012, and MID filed replies on February

16  8, 2012.  The Court found these matters suitable for decision without oral argument pursuant to Local

17  Rule 230(g) and vacated the scheduled hearing.

18  **II.     LEGAL STANDARDS**

19  **A.     Expert Testimony**

20  Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Under Rule 702,

21  a proposed expert witness must first qualify as an expert by "knowledge, skill, experience, training, or

22  education."  Fed. R. Evid. 702.  The proposed expert witness may then testify in the form of an opinion

23  if: "(a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or

24  to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the

25  product of reliable principles and methods; and (d) the expert has reliably applied the principles and

26  methods to the facts of the case."  Id.

27

28  _____

[2] The complaint asserts a violation of California Government Code Section 12950 as the second cause of action and a violation of California Government Code Section 12540 as the fourth cause of action.  (Doc. 1, Compl., at 8.)  However, it appears that California Government Code Sections 12940(h) and 12940(k) are the respective, relevant provisions.

4

1    The trial court serves a special "gatekeeping" function with respect to Rule 702.  Kumho Tire

2    Co. v. Carmichael, 526 U.S. 137, 147 (1999).  The trial court must make an initial assessment of the

3    proposed expert testimony to ensure that it "rests on a reliable foundation and is relevant to the task at

4    hand."  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993).  In other words, the trial court

5    must consider (1) whether the reasoning or methodology underlying the expert testimony is valid (the

6    reliability prong); and (2) whether the reasoning or methodology can be applied to the facts in issue (the

7    relevancy prong).  See id. at 592-93.

8    To determine the reliability of expert testimony, the Supreme Court has identified four factors

9    that a trial court may consider: "(1) whether the 'scientific knowledge . . . can be (and has been) tested';

10   (2) whether 'the theory or technique has been subjected to peer review and publication'; (3) 'the known

11   or potential rate of error'; and (4) 'general acceptance.'"  Obrey v. Johnson, 400 F.3d 691, 696 (9th Cir.

12   2005) (quoting Daubert, 509 U.S. at 593-94).  These factors, however, are not exclusive.  See Kumho

13   Tire, 526 U.S. at 150 ("Daubert makes clear that the factors it mentions do *not* constitute a definitive

14   checklist or test.") (emphasis in the original) (citation and internal quotation marks omitted).  Rather,

15   the trial court enjoys "broad latitude" in deciding how to determine the reliability of proposed expert

16   testimony.  Id. at 141-42.  As to relevancy, the Supreme Court has explained that expert testimony is

17   relevant if it assists the trier of fact in understanding evidence or determining a fact in issue in the case.

18   Daubert, 509 U.S. at 591.

19   The proponent of the expert testimony carries the burden of proving its admissibility.  Fed. R.

20   Evid. 702, advisory committee's note (2000 amend.); see Lust v. Merrell Dow Pharms., Inc., 89 F.3d

21   594, 598 (9th Cir. 1996).  In the context of expert scientific testimony, the Ninth Circuit has explained

22   that the proponent meets this burden by offering "some objective, independent validation of the expert's

23   methodology" establishing that the expert's findings are based on "sound science."  Daubert v. Merrell

24   Dow Pharms., Inc., 43 F.3d 1311, 1316 (9th Cir. 1995) ("Daubert II").

25   **B.      Summary Judgment**

26   Summary judgment is appropriate when the pleadings, the disclosure materials, the discovery,

27   and the affidavits provided establish that "there is no genuine dispute as to any material fact and the

28   movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one which

1   may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

2   A dispute is genuine if the evidence is such that a reasonable trier of fact could return a verdict in favor

3   of the nonmoving party.  Id.

4          A party seeking summary judgment "always bears the initial responsibility of informing the

5   district court of the basis for its motion, and identifying those portions of the pleadings, depositions,

6   answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

7   demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317,

8   323 (1986) (internal quotation marks omitted).  Where the movant will have the burden of proof on an

9   issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for

10  the moving party." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  "On an issue

11  as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely

12  by pointing out that there is an absence of evidence to support the nonmoving party's case." Id. (citing

13  Celotex, 477 U.S. at 323).

14         If the movant has sustained its burden, the nonmoving party must "show a genuine issue of

15  material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." FTC v.

16  Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in the original).  The nonmoving party must

17  go beyond the allegations set forth in its pleadings.  See Fed. R. Civ. P. 56(c).  "[B]ald assertions or a

18  mere scintilla of evidence" will not suffice.  Stefanchik, 559 F.3d at 929.  Indeed, the mere presence of

19  "some metaphysical doubt as to the material facts" is insufficient to withstand a motion for summary

20  judgment.   Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "Where

21  the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

22  is no 'genuine issue for trial.'" Id. at 587.

23         In resolving a summary judgment motion, "the court does not make credibility determinations

24  or weigh conflicting evidence." Soremekun, 509 F.3d at 984.  That remains the province of the jury.

25  See Anderson, 477 U.S. at 255.  Instead, "[t]he evidence of the [nonmoving party] is to be believed, and

26  all justifiable inferences are to be drawn in [its] favor." Id.  Inferences, however, are not drawn out of

27  the air; the nonmoving party must provide a factual predicate from which the inference may justifiably

28  be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985).

1  **III.    DISCUSSION**

2      **A.    Motion to Exclude Dr. Sarkisian's Expert Testimony**

3      Ms. LaCava presents the expert testimony of Dr. Sarkisian as support for her position that she

4  received unequal pay.  For his part, Dr. Sarkisian offers a salary survey that lists five individuals, Ms.

5  LaCava included, and their salary potential at MID, Turlock Irrigation District, and Modesto Irrigation

6  District.  (Doc. 25-3, Def.'s Mot. to Exclude Expert Testimony, Ex. B.)  From this information, Dr.

7  Sarkisian opines:

8          Research was conducted on October 29, 2010 regarding the comparison of five
           managerial positions with [MID] and similar positions with Turlock Irrigation District
9          and Modesto Irrigation District.  A summary of our research findings are attached,
           showing clearly that [Ms. LaCava] compared to Romero Ceja, Robby Cooper, Tom
10         Rodgers and Mike Higgins would be best described as an 'outcast' salary-wise.

11  (Id., Ex. A at 7.)  MID now seeks to exclude Dr. Sarkisian's salary survey and opinion on unequal pay

12  on the grounds that (1) Dr. Sarkisian is not qualified to conduct salary surveys on unequal pay; and (2)

13  Dr. Sarkisian's methodology in conducting his salary survey is unreliable.[3]

14      **1.    Dr. Sarkisian's Qualifications**

15      As noted above, a proposed expert witness must first qualify as an expert by "knowledge, skill,

16  experience, training, or education."  Fed. R. Evid. 702.  In this case, MID contends that Dr. Sarkisian

17  lacks any experience in conducting salary surveys on unequal pay and therefore cannot qualify as an

18  expert on this matter.  As support for its argument, MID points to certain excerpts from Dr. Sarkisian's

19  deposition testimony in which he states that his area of expertise lays in examining the employment and

20  earning potential of an individual before and after a given incident, but fails to express any particular

21  expertise in salary surveys relating to unequal pay.

22      The Court declines to take such a narrow view in assessing the qualifications of Dr. Sarkisian

23  to testify as an expert on unequal pay.  See Thomas v. Newton Int'l Enters., 42 F.3d 1266, 1269 (9th Cir.

24  1994) ("[T]he advisory committee notes emphasize that Rule 702 is broadly phrased and intended to

25  embrace more than a narrow definition of qualified expert.").  Dr. Sarkisian has provided a declaration

26  clarifying his earlier deposition testimony.  Therein, Dr. Sarkisian asserts that as part of his analysis in

27

28          [3] Dr. Sarkisian opined on other matters, specifically employability, mitigation, and loss of earnings.  MID does not
     seek to exclude this testimony.  (Doc. 40, Def.'s Reply, at 1.)

7

1    examining an individual's employment and earning potential, he conducts salary surveys.  (Doc. 38-1,

2    Decl. of Dr. Sarkisian, ¶ 4.)  In fact, Dr. Sarkisian maintains that he has performed over 10,000 salary

3    surveys over the course of his career.  (Id. ¶ 5.)  Although this expertise is not specific to unequal pay,

4    the Court finds that, as a general matter, Dr. Sarkisian has sufficient relevant experience to perform a

5    salary survey and to testify on unequal pay.  Whether an expert is the "best" qualified or has sufficient

6    specialized knowledge is generally a matter of weight, not admissibility.  See Holbrook v. Lykes Bros.

7    Steamship Co., 80 F.3d 777, 782 (3d Cir. 1996).

8                     **2.     Dr. Sarkisian's Methodology**

9            Next, MID argues that Dr. Sarkisian's salary survey is unreliable because he failed to adhere to

10   accepted protocols for determining unequal pay in the workplace.  As support for its argument, MID

11   presents the supplemental report of its own expert, Dr. David Friedland, in which the expert opines that

12   Dr. Sarkisian failed to consider key variables in determining unequal pay, including: job skill, effort,

13   responsibility, working conditions, longevity of service, disciplinary record, and the existence of job-

14   related training programs.  (Doc. 25-3, Ex. D, Suppl. Report of Dr. Friedland, at 2-4.)  Dr. Friedland

15   opines that all these factors can affect salary and therefore must at least be considered when evaluating

16   whether one person is being paid unequally to another.  (Id. at 2.)

17           MID's argument is well-taken.  To establish a prima facie case of sex discrimination under 42

18   U.S.C. § 2000e and California Government Code Section 12940, a plaintiff must show, among other

19   things, that his employer treated him differently from a "similarly situated employee" who does not

20   belong to the same protected class as the plaintiff.  Cornwell v. Electra Cent. Credit Union, 439 F.3d

21   1018, 1028 (9th Cir. 2006) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  It

22   follows, then, that to the extent that Dr. Sarkisian seeks to testify on discrimination in the context of

23   unequal pay, his inquiry must focus on similarly situated employees and his salary survey may not be

24   comprised of randomized individuals.

25           Nevertheless, as highlighted by MID, Dr. Sarkisian testified in his deposition that he did not

26   discuss several obvious factors in his salary survey that would have focused his analysis on similarly

27   situated employees.  First, Dr. Sarkisian testified that his salary survey did not discuss an employee's

28   varying skill level.  (Doc. 25-3, Dr. Sarkisian Depo., at 33:1-6.)  Second, Dr. Sarkisian testified that his

                                                          8

1  salary survey did not discuss an employee's varying job efforts.  (Id. at 33:7-11.)  Third, Dr. Sarkisian

2  testified that his salary survey did not discuss an employee's varying job responsibilities.  (Id. at 33:12-

3  16.)  Lastly, Dr. Sarkisian testified that his salary survey did not discuss an employee's varying working

4  conditions.  (Id. at 33:17-22.)

5          Dr. Sarkisian never directly addresses these concerns.  Nor does Dr. Sarkisian adequately explain

6  his own methodology for conducting salary surveys to show that it is reliable.  Critically, there is no

7  explanation as to how or why he selected Romero Ceja, Robby Cooper, Tom Rodgers, and Mike Higgins

8  as benchmarks for Ms. LaCava's salary.  Dr. Sarkisian simply asserts that he relies on a "number of

9  sources" when conducting his salary surveys, including direct employer information and published data

10  from sources such as the U.S. Labor Department, the U.S. Census Bureau, and the State of California

11  EDD Labor Market Information Division.  (Doc. 38-1, Decl. of Dr. Sarkisian, ¶ 5.)  Yet, this is a broad,

12  abstract statement, and none of that information is discussed or clearly reflected in Dr. Sarkisian's salary

13  survey in this case.

14          In a final attempt to bolster his salary survey, Dr. Sarkisian has provided the Court a copy of a

15  research memorandum drafted by one of his assistants, Robert Cobb.  (Doc. 38-2, Ex. A, Cobb Mem.)

16  Dr. Sarkisian asserts that he reviewed this memorandum in formalizing his opinion.  (Doc. 38-1, Decl.

17  of Dr. Sarkisian, ¶ 8.)  The memorandum, however, suffers the same defects as his own salary survey.

18  In fact, other than the addition of specific job titles and formatting, the memorandum is identical to Dr.

19  Sarkisian's salary survey in every respect.  Again, there is no explanation as to what criteria or standards

20  were used in gathering information for the memorandum, and there is no meaningful discussion as to

21  why this methodology is reliable.

22          As a whole, there is little confidence that Dr. Sarkisian has "employ[ed] in the courtroom the

23  same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho

24  Tire, 526 U.S. at 152.  Accordingly, because Ms. LaCava has failed to carry her burden in showing that

25  Dr. Sarkisian's salary survey and testimony on unequal pay is reliable and admissible, MID's motion

26  to exclude expert testimony is GRANTED: Dr. Sarkisian's salary survey and opinion regarding unequal

27  pay is EXCLUDED, but he may still testify as to employability, mitigation, and loss of earnings.

28  ///

**B.      Motion for Summary Judgment**

**1.      Exhaustion of Administrative Remedies**

As an initial matter, MID maintains that Ms. LaCava cannot ground any of her discrimination claims on unequal pay issues arising before January 1, 2009 or after July 30, 2009, because she failed to exhaust her administrative remedies with respect to those issues.  For the same reason, MID argues that Ms. LaCava cannot base any of her claims on any alleged sexual harassment.

**a.      Exhaustion Framework**

To pursue a claim for discrimination under 42 U.S.C. § 2000e et seq. ("Title VII"), a plaintiff must timely exhaust administrative remedies prior to filing suit.  See Sommatino v. United States, 255 F.3d 704, 707-08 (9th Cir. 2001).  In order to exhaust administrative remedies, a plaintiff must file a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") within 180 days from the last act of alleged discrimination, unless the plaintiff has already instituted proceedings with a state or local agency, in which case the charge must be filed within 300 days of the last discriminatory act, or within 30 days of receiving notice that the state or local agency has terminated proceedings, whichever happens first.  42 U.S.C. § 2000-5(e).

A similar framework applies to claims for discrimination brought under California Government Code Section 12900 et seq. ("FEHA").  Under FEHA, a plaintiff must exhaust administrative remedies prior to filing suit by filing a complaint with the DFEH and obtaining from the DFEH a notice of right to sue.  Romano v. Rockwell Int'l, Inc., 14 Cal. 4th 479, 492 (1996).  A plaintiff must file his complaint with the DFEH within one year of the occurrence of the unlawful employment practice or complained of conduct.  Cal. Gov. Code § 12960(d).  A complaint filed with the DFEH is deemed "constructively filed" with the EEOC; likewise, a discrimination charge filed with the EEOC is deemed constructively filed with the DFEH.  29 C.F.R. § 1626.10(c); Laquaglia v. Rio Hotel & Casino, Inc., 186 F.3d 1172, 1175-76 (9th Cir. 1999).

**b.      Unequal Pay Issues**

Ms. LaCava contends that the DFEH complaint she filed on September 10, 2009 was sufficient to exhaust all of her sex discrimination claims and allegations of unequal pay.  As discussed above, Ms. LaCava asserted in her DFEH complaint that: (1) from approximately January 1, 2009 through July 30,

2009, she was denied equal pay; (2) she believed that she was denied equal pay because of her sex; (3) on January 1, 2009, she was denied a step increase while other male managers were given an increase; and (4) investigation will reveal that she is paid less than her male counterparts.  (Doc. 32-8, Ex. 15, DFEH Compl. at 2.)  MID, on the other hand, emphasizes the fact that Ms. LaCava indicated a specific time frame for when she was denied unequal pay.  Thus, in MID's opinion, the DFEH complaint only exhausted events that occurred within that time frame.

"[T]he 'scope' of the judicial complaint is limited to the 'scope' of the . . . investigation which can reasonably be expected to grow out of the charge of discrimination." Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir. 1970).  Allegations of discrimination not included in the plaintiff's administrative charge may not be considered "unless the new claims are 'like or reasonably related to the allegations contained in the . . . charge.'" B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1100 (9th Cir. 2002) (quoting Green v. Los Angeles City of Superintendent of Schs., 883 F.2d 1472, 1475-76 (9th Cir. 1989)); Soldinger v. Northwest Airlines, 51 Cal. App. 4th 345, 381-82 (Ct. App. 1996).  In order to determine whether a plaintiff has exhausted allegations that he did not specify in his charge, "it is appropriate to consider such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any location at which discrimination is alleged to have occurred." B.K.B., 276 F.3d at 1100.  Finally, a court must remain mindful that charges are often made by those who are unfamiliar with the technical aspects of formal pleading, and therefore should be construed with the "utmost liberality." Sosa v. Hiraoka, 920 F.2d 1451, 1458 (9th Cir. 1990).  See also Kaplan v. Int'l Alliance of Theatrical & Stage Employees, 525 F.2d 1354, 1359 (9th Cir. 1975).

MID's challenge is unfounded.  The fact that Ms. LaCava identified a time frame in her charge is not dispositive of what claims she may bring now in this action.  Rather, the focus is on whether the new claims are "like or reasonably related to the allegations contained in the . . . charge." B.K.B., 276 F.3d at 1100.  It is not a far logical leap to deduce from Ms. LaCava's DFEA complaint that she sought to protest the salary increase in late 2008 for only male managers in addition to the on-going issues she experienced at MID regarding unequal pay, despite whatever time frame she may have affixed to her allegations.  To find otherwise would require the Court to accept an impermissibly strict construction

1    of the DFEA complaint.  Cf. Sosa, 920 F.2d at 1458.[4]

2                           **c.      Sexual Harassment**

3          Ms. LaCava asserts that she amended her DFEH charge in April 19, 2010 to include allegations

4    regarding sexual harassment.  It is undisputed, however, that the alleged sexual harassment occurred

5    some time before December 2008, over one year before Ms. LaCava amended her charge.  Therefore,

6    Ms. LaCava's sexual harassment allegations have not been exhausted, are time-barred, and may not be

7    used as a basis for liability in any of Ms. LaCava's proceeding claims.  See Grosz v. Boeing Co., 455

8    F. Supp. 2d 1033, 1042 (C.D. Cal. 2006) ("Any discrete . . . act that occurs outside the limitations period

9    is time-barred, and cannot form the basis for a discrimination claim.").

10                   **2.      Sex Discrimination Under 42 U.S.C. § 2000e and California Government**

11                           **Code Section 12940**

12         Title VII and FEHA make it an unlawful employment practice for an employer to discriminate

13   based on sex.  See 42 U.S.C. § 2000e-2(a); Cal. Gov. Code. § 12940(a).  Claims under the two laws are

14   analyzed similarly.  See Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270 (9th Cir. 1996); Clark v.

15   Claremont University Center, 6 Cal. App. 4th 639, 662 (Ct. App. 1992) ("Although the state and federal

16   antidiscrimination legislation differ in some particulars, their objectives are identical, and California

17   courts have relied upon federal law to interpret analogous provisions of the state statute.") (citation and

18   internal quotation marks omitted).

19         Under the framework enunciated by the Supreme Court in McDonnell Douglas, a plaintiff who

20   alleges disparate treatment under Title VII carries the initial burden of establishing a prima facie case

21   of discrimination.  See Chuang v. University of California Davis, 225 F.3d 1115, 1123 (9th Cir. 2000).

22   In the employment context, the plaintiff must show that (1) he belongs to a protected class; (2) he was

23   qualified for the position or otherwise performed his job satisfactorily; (3) he was subject to an adverse

24   employment action; and (4) his employer treated him differently than a "similarly situated employee"

25   who does not belong to the same protected class as the plaintiff.  Cornwell, 439 F.3d at 1028.  See also

26   Chuang, 225 F.3d at 1123.  If the plaintiff is able to establish a prima facie case of discrimination, then

27

28        [4] Ms. LaCava concedes, however, that to the extent that any unequal pay issues arose outside the one-year statute
     of limitations period for filing her DFEA complaint (i.e., before September 10, 2008), the issues are precluded.  (See Doc.
     39, Pl.'s Opp'n to Mot. for Summ. J., at 24.)

1    the burden of production shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for

2    its allegedly discriminatory conduct." Vasquez v. County of Los Angeles, 349 F.3d 634, 640 (9th Cir.

3    2003).  If the defendant meets this burden, the plaintiff must then show that the defendant's proffered

4    reason for its conduct is pretextual.  See Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007);

5    Chuang, 225 F.3d at 1124.

6         As an alternative to the McDonnell Douglas framework, a plaintiff responding to a defendant's

7    motion for summary judgment "may simply produce direct or circumstantial evidence demonstrating

8    that a discriminatory reason more likely than not motivated [the employer]." McGinest v. GTE Serv.

9    Corp., 360 F.3d 1103, 1122 (9th Cir. 2004) (citation omitted).  In this respect, if a plaintiff offers direct

10   evidence of discriminatory motive, "a triable issue as to the motivation of the employer is created even

11   if the evidence is not substantial. . . . it need be very little." Goodwin v. Hunt Wesson, Inc., 150 F.3d

12   1217, 1221 (9th Cir. 1988) (citation and internal quotation marks omitted).  "Direct evidence typically

13   consists of clearly . . . discriminatory statements or actions by the employer." Coghlan v. American

14   Seafoods Co. LLC., 413 F.3d 1090, 1095 (9th Cir. 2005).

15        Here, MID argues that Ms. LaCava fails to show a prima facie case of discrimination because

16   Ms. LaCava has no evidence that MID treated her differently than a similarly situated employee who is

17   not female.  "[T]o show that the 'employees' allegedly receiving more favorable treatment are similarly

18   situated . . . the individuals seeking relief must demonstrate, at the least, that they are similarly situated

19   to those employees in all material respects." Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006).  As a

20   general matter, "other employees are similarly situated to the plaintiff when they have similar jobs and

21   display similar conduct." Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1114 (9th Cir. 2011)

22   (citation and internal quotation marks omitted).  This requirement is "strict," and "courts recognize the

23   probability that a manager may have different but legitimate concerns about the conduct of different

24   employees." Harris v. Winter, CIV. S-02-2436 KJM PS, 2007 U.S. Dist. LEXIS 72557, at *41 (E.D.

25   Cal. Sept. 28, 2007).

26        In addition to Dr. Sarkisian's salary survey, Ms. LaCava has produced the benchmark salary

27   survey conducted by David Carroll.  (Doc. 39-9, Ex. D.)  David Carroll's survey lists six manager or

28   supervisor positions at MID and compares them to Ms. LaCava's position by certain categories: direct

reports, reports in group, total employees supervised, union represented, journeymen classifications supervised, and special skills.  From this, David Carroll concludes that Ms. LaCava is the lowest paid manager, despite supervising more employees than other manger positions, and recommends that Ms. LaCava be promoted to a higher salary classification.  The reason why this salary survey is of no aid to Ms. LaCava here is that a close look at the survey reveals that all the positions listed have varying skill or responsibility levels.  David Carroll may very well have concluded that Ms. LaCava should be paid more, but this salary survey, in of itself, fails to show how Ms. LaCava is being treated differently than a similarly situated employee "in *all* material respects."  <u>Moran</u>, 447 F.3d at 755 (emphasis added).[5]  It is Ms. LaCava's burden to make that showing, and she did not.

Perhaps conceding this point, Ms. LaCava does not address this issue but rather argues in her opposition that she has provided circumstantial evidence of MID's discriminatory motive.  Ms. LaCava stresses that her planned salary raise in 2009 was delayed while those of male managers were not; that she and another female manager were the lowest classified managers;[6] and that her position was lower than what it should have been under MID's internal policies.  The trouble with this argument, other than the lack of supported evidence, is that Ms. LaCava strains to show that she is being treated differently *because* she is female.  In other words, there is nothing more than a scintilla of evidence, at best, of discriminatory animus.  Accordingly, for all these reasons, MID's motion for summary judgment is GRANTED with respect to this claim.

### 3.    Retaliation Under California Government Code Section 12940(h)

Under Section 12940(h), it is an unlawful employment practice for an employer to "discharge, expel, or otherwise discriminate against any person" because that person has engaged in conduct that is protected under FEHA.  Cal. Gov. Code § 12940(h).  To establish a prima facie case of retaliation under Section 12940(h), a plaintiff must show that (1) he or she engaged in protected activity, (2) the employer subjected the employee to an adverse employment action, and (3) a causal connection exists

---

[5] Ms. LaCava's other evidence regarding pay disparity is also less than enlightening.  Ms. LaCava focuses heavily on what other irrigation districts pay their employees.  However, the Court strains to see how this is relevant as to whether MID treats its own employees differently.

[6] It cannot be inferred from this that MID systematically places female managers in lower management positions.  Vanessa Lara, Ms. LaCava's superior, was at all times relevant, classified at a Level 28 salary.  (<u>See</u> Doc. 29, Lara Dep. at 30:25-31:8.)

between the protected activity and the employer's action.  See Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005); Nidds v. Schindler Elevator Corp., 113 F.3d 912, 919 (9th Cir. 1996).  "Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action."  Yanowtiz, 36 Cal. 4th at 1042.  If the employer provides a legitimate, nonretaliatory reason, the burden shifts back to the plaintiff to show that the employer's proffered reason is merely pretextual.  Id.; see also Joaquin v. City of Los Angeles, 202 Cal. App. 4th 1207, 1220 (Ct. App. 2012).

### a.     Prima Facie Case

There is no serious dispute between the parties that Ms. LaCava has established a prima facie case of retaliation.  First, on September 10, 2009, Ms. LaCava filed a complaint of discrimination with the DFEH and the EEOC, which constitutes protected conduct under FEHA.  See McRae v. Dep't of Corrections & Rehabilitation, 142 Cal. App. 4th 377, 386 (Ct. App. 2006).  Second, Ms. LaCava has shown that she suffered two adverse employment actions: a disciplinary report in January 2010 and subsequent discharge from employment in February 2010.  See id. (actions that have a detrimental and substantial effect on a plaintiff's employment are adverse employment actions).  Third, Ms. LaCava has shown a causal link between the filing of her complaint of discrimination and the adverse employment actions.  Specifically, Ms. LaCava has offered evidence that John Sweigard was aware of her complaint with the DFEH and the EEOC, (see Doc. 39-9, Ex. C, Sweigard Depo., at 47:6-48:12,) and that there was temporal proximity (four months) between the filing of the complaint and the disciplinary actions taken by John Sweigard.  See McRae, 142 Cal. App. 4th at 388 ("A plaintiff can satisfy his or her initial burden . . . by producing evidence of nothing more than the employer's knowledge that the employee engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision.").  Therefore, the burden shifts to MID to demonstrate a legitimate, nonretaliatory reason for disciplining and discharging Ms. LaCava.

### b.     Legitimate, Nonretaliatory Reason

MID presents evidence demonstrating that there were legitimate grounds for disciplining Ms. LaCava.  In his deposition, John Sweigard testified to the following.  Some time in November 2009, he became aware of a friend who had experienced trouble with his MID billing.  (See Doc. 39-9, Ex. C,

Sweigard Depo., at 41:1-17.)  After his appointment to General Manger, John Sweigard forwarded the complaint to Vanessa Lara and asked her to investigate.  (Id. at 85:18-86:2.)  Approximately one week later, Vanessa Lara reported that certain processes and controls were missing in the customer service department which were causing customers to improperly receive past-due and shut-off notices.  (Id. at 86:7-19.)  Vanessa Lara believed that this was a major management issue and therefore recommended that disciplinary action should be taken against the customer service manager.  (Id. at 87:4-88:13; 93:2-95:22.)  Therefore, John Sweigard and Vanessa Lara prepared a Management Deficiency Report against Ms. LaCava.  (Id. at 95:18-22.)

MID also presents evidence demonstrating that there were legitimate grounds for restructuring MID through the elimination of personnel.  Hicham Eltal asserts that as Interim General Manager, he determined in late 2009 that MID could not continue operating its organizational structure and that its staffing would need to be reduced due to budgetary and efficiency concerns. (Doc. 27-2, Eltal Decl., ¶¶ 2-3.)  Hicham Eltal asserts that he therefore initiated a study into the restructuring of MID personnel, including those in the customer service department.  (Id. ¶ 4.)

For his part, John Sweigard asserts that when he assumed the role of General Manager in early 2010, his first task was to create an operating budget for MID and this necessarily included reviewing any personnel restructuring plans.  (See Doc. 30, Sweigard Depo., at 34:3-18.)  John Sweigard further asserts that after reviewing the materials and recommendations generated from Hicham Eltal's study, he decided that reductions in staff could be made.  (Id. at 35:18-37:16.)  As such, John Sweigard states that he presented his proposed reductions in staff to the Board of Directors in February 2010, and the plan was approved.  (Id. at 40:1-4.)  In the end, John Sweigard maintains that this action, in addition to two other rounds of staff reductions in 2010, led to around $1,361,000 in savings from reduced staff salaries and benefits.  (Id. at 75:13-76:17.)

### c.   Showing of Pretext

The dispositive question, then, is whether Ms. LaCava has produced evidence that is sufficient to show that there exists a genuine issue of material fact as to whether MID's reasons for disciplining and subsequently discharging Ms. LaCava were merely pretextual.  A plaintiff can establish pretext by "either directly persuading the court that a discriminatory reason more likely motivated the employer or

indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). A plaintiff's evidence in this regard must be "specific" and "substantial." Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir. 1983). A mere refutation of the employer's proffered reason will not suffice. See Little v. Windermere Relocation, Inc., 301 F.3d 958, 969 (9th Cir. 2002).

Ms. LaCava offers evidence that her complaint of discrimination with the DFEH was the true reason why she was disciplined and discharged. First, as already noted, Ms. LaCava has produced some evidence indicating that John Sweigard was aware of Ms. LaCava's complaint with the DFEH. Second, Ms. LaCava has produced evidence that calls into question whether John Sweigard or Vanessa Lara originated the idea that Ms. LaCava should be disciplined. A reasonable inference can be drawn from an e-mail sent from John Sweigard to Vanessa Lara on January 18, 2010 that John Sweigard initiated the disciplinary process. (Doc. 39-9 at 12.) Third, Ms. LaCava asserts that John Sweigard rejected any attempt by Ms. LaCava to submit an action plan for rectifying the customer complaints that served the basis for the Management Deficiency Report; instead, John Sweigard discharged Ms. LaCava just one day after she submitted her rebuttal. Fourth, and most critically, Ms. LaCava asserts that just two weeks after being discharged, she met with John Sweigard, at which point he asked her to "drop everything" and to "wipe the slate clean" and in return he "personally would ensure" that she would be reinstated in a new position with MID. (Doc. 39-3, Ms. LaCava Decl., ¶ 31.) According to Ms. LaCava, this was a clear effort by John Sweigard to induce her into dismissing her DFEH complaint. (Id.) Viewing this evidence in the light most favorable to Ms. LaCava, there exists a genuine dispute of fact as to pretext. Accordingly, MID's motion for summary judgment is DENIED with respect to this claim.

### 4.    Whistleblower Retaliation Under California Labor Code Section 1102.5

Section 1102.5 is a whistleblower statute; it makes it unlawful for an employer to retaliate or otherwise prevent an employee from disclosing information to any law enforcement or governmental agency, where the employee has reasonable cause to believe that the information discloses a violation of federal or state law. See Cal. Labor Code § 1102.5. In this case, Ms. LaCava claims that she was retaliated against after she reported sex discrimination.

MID now seeks summary judgment on this claim, arguing that Ms. LaCava failed to exhaust

administrative remedies with respect to this claim *because she failed to file a government tort claim pursuant to California Government Code Section 945.4.*  As support for its argument, MID cites and relies on this Court's decision in <u>Tumbling v. Merced Irrigation Dist.</u>, Case No. CV F 08-01801 LJO DLB, 2010 U.S. Dist. LEXIS 101404, at *65-67 (E.D. Cal. Sept. 27, 2010).  There, this Court stated: "The administrative remedy for a Section 1102.5 claim is the presentment of a government tort claim [under California Government Code Section 945.4]." <u>Id.</u> at *65.  Because the plaintiff conceded that he had not filed such a claim, this Court granted summary judgment in favor of the defendant on the plaintiff's Section 1102.5 claim.  <u>Id.</u> at *67.

 As an initial matter, it is important to distinguish the two issues: exhaustion of administrative remedies and the presentment of a government tort claim under California Government Code Section 945.4.  First, the California Supreme Court has held that prior to filing a claim under Section 1102.5, a plaintiff must exhaust his administrative remedies.  <u>See</u> <u>Campbell v. Regents of Univ. of California</u>, 35 Cal. 4th 311, 333-34 (2005).  Federal district courts in California vary as to *which* administrative remedies are sufficient in this regard, but a strong consensus of courts have concluded that California Labor Code Section 98.7 provides the relevant course.  <u>See</u> <u>Ferretti v. Pfizer Inc.</u>, Case No. 11-CV-04486, 2012 U.S. Dist. LEXIS 27214, at *14 (N.D. Cal. Feb. 29, 2012) (courts in the Northern District of California have "uniformly" held that compliance with Section 98.7 is required for the exhaustion of a claim under Section 1102.5); <u>Hanford Exec. Mgmt. Employee Ass'n v. City of Hanford</u>, 1:11-CV-00828-AWI-DLB, 2011 U.S. Dist. LEXIS 132783, at *36-37 (E.D. Cal. Nov. 17, 2011) (dismissing Section 1102.5 claim because plaintiff did not comply with Section 98.7); <u>Warren v. City of Barstow</u>, Case No. EDCV 08-000405-SGL (OPx), 2008 U.S. Dist. LEXIS 105228, at *2-3 (C.D. Cal. Dec. 15, 2008) (same).  Under Section 98.7, "[a]ny person who believes that he or she has been discharged or . . . discriminated against in violation of any law under the jurisdiction of the Labor Commissioner shall file a complaint *with the division* within six months after the occurrence of the violation."  Cal. Labor Code § 98.7(a) (emphasis added).

 In contrast, California Government Code Section 945.4 provides that no suit for damages may be brought *against a public entity* until a written claim has been presented *to the public entity* and has been acted upon by the board or deemed to have been rejected.  In other words, to file suit for damages

against a public entity, the plaintiff must first present his tort claim to the entity. <u>Munoz v. California</u>, 33 Cal. App. 4th 1767, 1776 (Ct. App. 1995). Compliance with this requirement constitutes an element of a cause of action for damages against a public entity, and failure to meet this requirement is fatal to the claim. <u>See</u> <u>State v. Superior Court (Bodde)</u>, 32 Cal. 4th 1234, 1239, 1244 (2004); <u>Karim-Panahi v. Los Angeles Police Dep't</u>, 839 F.2d 621, 627 (9th Cir. 1988).

Exhaustion and the presentment of a government tort claim are therefore distinct requirements: a plaintiff asserting a claim under Section 1102.5 must always exhaust administrative remedies prior to filing suit, whereas the presentment of a government tort claim is only required when the claim is brought against a public entity. Nevertheless, where, as here, a Section 1102.5 claim is brought against a public entity, *both* requirements must be satisfied. <u>See</u> <u>Imel v. County of El Dorado</u>, No. 2:10-CV-00688 FCD EFB, U.S. Dist. LEXIS 64379, at *9-12 (E.D. Cal. June 28, 2010) (dismissing plaintiff's Section 1102.5 claim where the plaintiff failed to adequately allege presentment of a government tort claim); <u>Creighton v. City of Livingston</u>, Case No. CV-F-08-1507 OWW/SMS, 2009 U.S. Dist. LEXIS 93720, at *6-36 (E.D. Cal. Oct. 7, 2009) (dismissing Section 1102.5 claim where the plaintiff exhausted administrative remedies but failed to adequately allege that he presented a government tort claim). As one court in this district noted:

> The exhaustion requirement [] facilitates the development of a complete factual record and allows the [administrative] agency to apply its expertise, both of which can assist later judicial review, if necessary. [Therefore,] [t]he presentation of a claim pursuant to the Tort Claims Act is a *separate, additional prerequisite* to commencing an action against the state or a local public entity and is *not a substitute for the exhaustion of an administrative remedy.*

<u>Bowman v. Yolo County</u>, 2:08-cv-00498-GEB-EFB, 2008 U.S. Dist. LEXIS 66351, at *5 (E.D. Cal. Sept. 4, 2008) (quoting <u>Richards v. Dep't of Alcoholic Beverages Control</u>, 139 Cal. App. 4th 304, 315 (Ct. App. 2006)) (alterations added in <u>Bowman</u>).

Returning to the case at hand, it is unclear whether MID's raises an exhaustion or presentation argument, or both. However, it is clear that Ms. LaCava has failed to satisfy both. In her opposition, Ms. LaCava responds to MID's attack by simply suggesting that she properly exhausted her retaliation claims when she amended her complaint with the DFEH to include a charge of retaliation. (<u>See</u> Doc. 39, Pl.'s Opp'n to Mot. for Summ. J., at 23-24.) Filing a charge with the DFEH is not a substitute for

1  exhausting administrative remedies under Section 98.7.  Hall v. Apt. Inv. & Mgmt. Co., No. 08-CV-

2  3447 CW, 2008 U.S. Dist. LEXIS 105698, at *10-11 (N.D. Cal. Dec. 19, 2008).  Nor is filing a charge

3  with the DFEH a substitute for presenting a government tort claim under Section 945.4.  See Jadwin v.

4  County of Kern, 1:07-CV-00026-OWW-DLB, 2009 U.S. Dist. LEXIS 28451, at *55 (E.D. Cal. April

5  3, 2009).  Indeed, Ms. LaCava fails to present any argument showing otherwise.  Accordingly, MID's

6  motion for summary judgment is GRANTED with respect to this claim.

7

8          **5.      Failure to Prevent Sex Discrimination Under California Government Code**

9                   **Section 12940(k)**

10          MID contends that Ms. LaCava's claim under California Government Code Section 12940(k)

11  fails because Ms. LaCava has failed to establish a claim for sex discrimination.  The Court agrees.  See

12  Tritchler v. County of Lake, 358 F.3d 1150, 1155 (9th Cir. 2004); Trujillo v. North County Transit Dist.,

13  63 Cal. App. 4th 280, 289 (Ct. App. 1998) ("[T]here is no logic that says an employee who has not been

14  discriminated against can [later] sue an employer for not preventing discrimination[.]").  Accordingly,

15  MID's motion for summary judgment is GRANTED with respect to this claim.

16

17

18

19  **IV.    CONCLUSION**

20          In accordance with the above, this Court:

21          1.      GRANTS MID's motion to exclude expert testimony and EXCLUDES Dr. Sarkisian's

22                   salary survey and opinion regarding unequal pay;[7]

23          2.      GRANTS MID's motion for summary judgment with respect to the sex discrimination

24                   claims under 42 U.S.C. § 2000e and California Government Code Section 12940;

25          3.      DENIES MID's motion for summary judgment with respect to the retaliation claim under

26                   California Government Code Section 12940(h);

27          4.      GRANTS MID's motion for summary judgment with respect to the whistleblower

28

       [7] Again, Dr. Sarkisian is not precluded from testifying on employability, mitigation, and loss of earnings.

retaliation claim under California Labor Code Section 1102.5;

5.    GRANTS MID's motion for summary judgment with respect to the failure to prevent sex

discrimination claim under California Government Code Section 12940(k); and

6.    ORDERS both parties to file pretrial statements by **March 23, 2012.**

IT IS SO ORDERED.

**Dated:    March 16, 2012**                          /s/ Lawrence J. O'Neill
                                                   UNITED STATES DISTRICT JUDGE